## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

    **BRADLEY ALLEN FUTCH,**            **CASE NO. 09-01841-NPO**

    **DEBTOR.**            **CHAPTER 7**


IN RE:

    **GARY A. FUTCH,**            **CASE NO. 09-51705-NPO**

    **DEBTOR.**            **CHAPTER 7**


**JOHN T. LANIER**            **PLAINTIFF**

**VS.**            **CONSOLIDATED**
            **ADV. PROC. NO. 09-00144-NPO**

**BRADLEY ALLEN FUTCH AND**
**GARY A. FUTCH**            **DEFENDANTS**


## MEMORANDUM OPINION ON COMPLAINTS
## TO DETERMINE DISCHARGEABILITY OF DEBT
## FILED IN CONSOLIDATED ADV. PROC. NO. 09-00144-NPO

This matter came before the Court for trial on December 3, 2010, (the "Trial") on the Complaint to Determine Dischargeability of Debt filed by John T. Lanier ("Lanier") against Bradley Allen Futch ("Bradley Futch") in adversary proceeding no. 09-00144-NPO and the nearly identical Complaint to Determine Dischargeability of Debt filed by Lanier against Gary A. Futch ("Gary Futch") in adversary proceeding no. 09-05090 (together, the "Adversary Complaints"). These two adversary proceedings, because they involved common questions of law and fact, were consolidated

into adversary proceeding no. 09-00144-NPO (the "Adversary") (Adv. Dkt. No. 8).[1]   Prior to the

consolidation, Bradley Futch filed the Answer to Complaint to Determine Dischargeability of Debt

on December 2, 2009, in adversary proceeding no. 09-00144-NPO (Case No. 09-00144-NPO, Adv.

Dkt. No. 4), and Gary Futch filed the Answer to Complaint to Determine Dischargeability of Debt

on December 2, 2009, in adversary proceeding number 09-05090-NPO (Case No. 09-05090-NPO,

Adv. Dkt. No. 4).   A Pre-trial Order was entered on November 30, 2010. (Adv. Dkt. No. 28).

At Trial, Charles Frank Fair Barbour represented Lanier, and Thomas L. Webb represented

Bradley Futch and Gary Futch (together, the "Futches").   By stipulation, the parties introduced into

evidence 28 joint exhibits.   These exhibits and the testimony of the parties were the only evidence

presented at Trial.   The Court, having considered the evidence, finds that Lanier is entitled to a

judgment of $1,948,801.35 against Bradley Futch and further finds that the debt reflected in the

aforementioned judgment against Bradley Futch and the debt reflected in the state court judgment

entered against Gary Futch prior to his bankruptcy filing in the principal amount of $1,948,801.35

are non-dischargeable under 11 U.S.C. § 523(a)(2)(A)[2] and § 523(a)(4) for the reasons set forth

below.[3]

---

[1] Unless stated otherwise, citations to the record are as follows: (1) citations to docket entries in the consolidated adversary proceeding, Case No. 09-00144-NPO, are cited as "(Adv. Dkt. No. _____)"; (2) citations to docket entries in the bankruptcy case of Bradley Futch are cited as "(Case No. 09-01841-NPO, Bankr. Dkt. No. _____)"; and (3) citations to docket entries in the bankruptcy case of Gary Futch are cited as "(Case No. 09-51705-NPO, Bankr. Dkt. No. ____)".

[2] Hereinafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code unless otherwise noted.

[3] Pursuant to Federal Rule of Civil Procedure 52, as made applicable to this Adversary by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

## Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Notice of the Trial was proper under the circumstances.

## Facts

What follows below is an outline of the facts that resulted in the entry of a state court judgment against Gary Futch and in favor of Lanier in the amount of $1,948,801.35 prior to Gary Futch filing bankruptcy. The dischargeability *vel non* of the debt reflected in the state court judgment is the subject of this Adversary. Also at issue is the dischargeability *vel non* of Lanier's claim against Bradley Futch in the same amount, for which no judgment yet exists. Because this Adversary involves the complex and highly volatile arena of commodity options trading, it is necessary to begin with a brief overview of certain aspects of the commodities market.

## A.    Commodity Futures

1.    Commodity futures trading, generally speaking, involves a contract for the sale or purchase of a fixed quantity of a particular commodity[4] at a set price for delivery at some future date.

---

[4] The Commodity Exchange Act ("CEA"), as amended by the Commodity Futures Modernization Act of 2000, defines commodities to include not only agricultural products but also products unrelated to agriculture:

> [W]heat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill fees, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in.

CEA, 7 U.S.C. § 1a(4).

United States v. Dial, 747 F.2d 163, 164 (7th Cir. 1985).  The mechanics of trading futures contracts

is aptly described as follows:

> A holder of futures contracts discharges his or her legal obligations under the contract
> by making or accepting delivery of the underlying commodity or by engaging in an
> opposite (offsetting) transaction–that is, purchasers and seller may extinguish their
> respective obligations to accept and deliver the subject commodity by forming
> offsetting contracts prior to the delivery date; the price differential between the
> opposite contracts determines the investor's profits or loss.  Investors in futures
> contracts rarely actually transfer ownership and possession of the underlying
> commodity.  Usually, people invest in futures contracts for the purpose of assuming
> (speculating) or shifting (hedging) the risk of price change in commodities: neither
> do they expect actual delivery, nor does it occur.

Commodity Futures Trading Comm'n v. Standard Forex, Inc., No. CV-93-0088, 1996 WL 435440

*1 (E.D.N.Y. July 25, 1996) (citations omitted).

2.      An individual who wishes to invest in the futures market must first approach a futures

commission merchant ("FCM").  Only an FCM may lawfully solicit or accept "orders for the

purchase or sale of any commodity for future delivery . . . on . . . any contract market."  CEA, 7

U.S.C. § 2. Because a futures contract involves a future commitment, the FCM will require the

customer to deposit only an amount of money that will insure payment if the trade results in losses.

Leist v. Simplot, 638 F.2d 283, 287 (2d Cir. 1980), aff'd sub nom. Merrill Lynch, Pierce, Fenner &

Smith, Inc. v. Curran, 456 U.S. 353 (1982).  This initial deposit, called "margin," generally is only

a percentage of the value of the futures contract.  Id.

3.      A very small percentage move in the price of a commodity can cause the value of a

futures contract to vary by the entire amount of the margin, or more.  Dimichele v. Nassbridges (In

re Nassbridges), 434 B.R. 573, 585 (Bankr. C.D. Cal. 2010).  This movement makes large gains

possible in short-term periods and *vice versa*, that is, large losses (that can exceed the margin)

possible in short-term periods.  Id. The potential for large profits is what entices investors to the futures market but that potential exists only because of the corresponding risk of substantial losses.

4.    An important part of any commodity trader's success is his ability to manage risk.

**B.    Commodity Options**

5.    Commodity options trading involves a unilateral contract that vests a person with the right, but not the obligation, either to buy or sell a commodity futures contract at a pre-determined price within a certain time period.  7 U.S.C. § 1a(25); British Am. Commodity Options Corp. v. Bagley, 552 F.2d 482, 484-85 (2d Cir. 1977).  The holder of an option to buy has a "call" option, while the holder of an option to sell has a "put" option.  Id. at 485.  The price at which the right may be exercised is the "strike price."  17 C.F.R. § 32.1(5).

**C.    The CTA**

6.    A commodity trading advisor ("CTA") is a person who, for compensation or profit, advises others about the advisability of trading in commodity futures or options.  7 U.S.C. § 1a(6). A CTA must register with the Commodity Futures Trading Commission ("CFTC"), an independent federal regulatory agency that administers and enforces the CEA.  CEA, 7 U.S.C. § 2.  A CTA may not trade for a client or advise a client until he has provided that prospective client with a disclosure document filed with the CFTC, which, *inter alia*, must include a risk disclosure statement (in verbatim) and information about the performance history and trading skills of the CTA. 17 C.F.R. §§ 4.31, 4.34.

**D.    The Parties**

7.    In this Adversary, Lanier is a successful businessman with a college degree in finance. Before 2007, Lanier had no experience in trading commodity futures or options and was not a sophisticated commodities investor.

8.      Gary Futch is well-experienced in market trading, having previously worked for World Capital, Inc., an investment firm. (Ex. 10).  During the time period relevant to this Adversary, he was not registered as a CTA.

9.      Bradley Futch is Gary Futch's son.  Bradley Futch graduated from Mississippi State University in Starkville, Mississippi, in December, 2006, with a bachelor of science degree in mechanical engineering.  At all relevant times, he was registered with the CFTC as a CTA.

**E.      The Non-parties**

10.      Bill Murphree ("Murphree") was Lanier's fraternity brother in college.  Murphree is not a defendant herein and did not testify as a witness at Trial.

11.      Tradewind Investments, a sole proprietorship, ("Tradewind SP") was owned and operated by Bradley Futch in Meridian, Mississippi.  Gary Futch was employed by Tradewind SP.  On February 28, 2007,  Tradewind SP became registered as a CTA. That same year, Bradley Futch incorporated Tradewind Investments, LLC ("Tradewind LLC") as a limited liability corporation.  Gary Futch arranged for the reservation of the name, "Tradewind Investments, LLC," with the Mississippi Secretary of State on May 30, 2007, however, the precise date of its formation from the Trial record is unclear.  (Ex. 17).  Sometime after its formation, Tradewind LLC was registered as a CTA, and Tradewind SP's registration with the CFTC was withdrawn.

**F.      Lanier's Relationship with the Futches**

12.      In the summer of 2007, Murphree introduced Lanier to Gary Futch as a prospective client of their company.[5]

---

[5] Lanier was told that the company was Tradewind LLC, but it was actually Tradewind SP at that time.  See infra p. 7 at ¶ 17.

13.    Gary Futch gave Lanier a one-page document that identified himself as having been an employee of World Capital, Inc. (Ex. 10). The document appears to be a page from World Capital, Inc.,'s disclosure document filed with the CFTC.

14.    At this initial meeting, Gary Futch pitched a commodity options trading strategy developed by their company. Gary Futch explained to Lanier that their trading strategy limited the risk of trading in commodity futures and options. He described their strategy as "buying protection." Other than this oblique description, it is unclear what other information Gary Futch provided Lanier about the program.   Apparently, it was sufficient to pique Lanier's interest, and he agreed to meet again with Gary Futch.

15.    Murphree arranged for Lanier to meet with Gary Futch and Bradley Futch on August 29, 2007, at Lanier's commercial hunting and fishing camp, the Shenandoah Plantation, located in Union Springs, Alabama. (Ex. 11 at 6). There, Lanier was introduced to Bradley Futch for the first time. From this point forward, the meeting will be referred to as the "Shenandoah Meeting."

16.    The day before the Shenandoah Meeting, Gary Futch instructed Murphree to tell Lanier to bring a copy of his driver's license, which he needed to submit with certain paperwork associated with Lanier's initial investment. (Ex. 11 at 7).

17.    At the Shenandoah Meeting, Murphree told Lanier he was the chief executive officer and chief operations officer of Tradewind LLC; Gary Futch was the chief financial officer, analyst, and authorized agent of Tradewind LLC; and "Brandon [sic] Futch" was the analyst, certified training agent, and chief compliance officer of Tradewind LLC. (Ex. 7). At Lanier's request, Murphree wrote this information on a piece of scrap paper. Id. Also, Gary Futch and Bradley Futch gave Lanier business cards inferring that they were both CTAs with Tradewind LLC. (Ex. 5). At this time, however, Gary Futch was not a CTA.

18.     Lanier testified that much of the discussion that took place at the Shenandoah Meeting focused upon the risk involved in trading commodity options.   Indeed, Lanier described himself as a risk-averse investor.  The Futches presented at Trial a very different description of Lanier.  They maintained that Lanier asked few questions at the Shenandoah Meeting, did not seem overly concerned about risk, and understood that investing in commodity options included the risk of losing more than the initial investment.

19.     At the Shenandoah Meeting, the Futches provided Lanier with a document entitled "Trade Methodology" that they apparently used as a promotional tool for soliciting prospective customers.  (Ex. 6). The Trade Methodology explained that the primary option trading strategy of Tradewind LLC was based on a "short strangle."  (Ex. 6 at 1).  A "short strangle" was described as "selling an out-of-money call option and an out-of-the-money put option on the same underlying asset with the same expiration date."  (Ex. 6 at 1).  Of particular significance to this Adversary, the Trade Methodology explained the program's risk-reduction strategy as follows:

> When something dramatic like [September 11th or the market crash in 1987] happens the market typically overreacts and large swings can take place. . . . In response to this, Tradewind has developed risk reduction strategies to protect against unlimited risk.  For each trade, we can hedge our sold option positions by purchasing options at precisely calculated levels.  For every option that is sold the strategy suggests purchasing a corresponding risk-limiting option.  By purchasing these protective options above and below each sold call and put, we can limit our market exposure in the event of a severe or sudden move in the market.

(Ex. 6 at 3-4).  The Trade Methodology included diagrams demonstrating how the protective options worked.  At Trial, Lanier referred to this strategy as "buying protection," the opposite of "trading naked."

20.     A footnote at the bottom of the last page of the Trade Methodology warns, "There is a substantial risk of loss associated with trading futures and options on futures."  (Ex. 6).

21.     Lanier testified that the Futches represented to him at the Shenandoah Meeting that in addition to never trading "naked," Tradewind LLC's trading program included three other risk-reduction strategies not expressly mentioned in the Trade Methodology:  (1)  never trading on "margin"; (2)  never risking more than 25% of any investment in a single trade; and (3) never risking more than the total amount of the initial investment.  It is these representations, all of which were false, that form the basis of Lanier's claims against the Futches.

22.     The Futches told Lanier that Tradewind LLC would execute the trades through Man Financial/MF Global ("MF Global"),[6] a FCM, and that Lanier would need to open an account there. Lanier did not fully understand the role of MF Global, a company that was unknown to him because of his inexperience in commodities trading, but he complied with their instructions nonetheless.

23.     At the Shenandoah Meeting, Lanier completed and signed several MF Global documents, including the following:  (a) Customer Account Application  (the "Application");  (b) Customer  Agreement,  (the  "Agreement");  (c) Discretionary  Trading  Authorization/Power of Attorney (the "Power of Attorney"); (d) Advisor's Agreement; and (e) Authorization for Deduction of Incentive Fees & Management Fees Paid to "Advisor" (the "Authorization for Fees") (Ex. 1). Lanier testified that he did not read any of these documents before signing them.

## G.     The Application

24.     The Application correctly reflected that Lanier had an annual income of $200,000, a net worth of $14.8 million, and no experience in commodity futures or commodity options trading.

---

[6] Man Financial later changed its name to MF Global.  For the sake of brevity, and because the distinction is not relevant to the issues before the Court, Man Financial is referred to as "MF Global."

25.     Just above Lanier's signature on the last page of the Agreement is the statement: "No modification of this Agreement is valid unless accepted by [MF Global] in writing . . . ." (Ex. 1 at 3).

**H.     The Power of Attorney**

26.     The Power of Attorney identified "Tradewind" as Lanier's agent with the authority to purchase and sell commodity futures contracts and options on commodity futures contracts, on margin or otherwise, in Lanier's account with MF Global. (Ex. 1 at 8). If Lanier had read the Power of Attorney, he would have learned about some of the risks involved in trading options, which was discussed in the last paragraph:

> The undersigned understands that there are many strategies that can be used in trading options, some of which have unlimited risk of loss and could result in the undersigned sustaining a total loss of all funds in the account and that the undersigned is liable for any deficit in the account resulting therefrom.

(Ex. 1 at 8). This same paragraph included a statement acknowledging that Lanier had discussed with "Tradewind" the risks associated with using its particular trading program:

> Customer acknowledges that Customer has discussed with the Company and the Agent the nature and risks of the strategy to be used in connection with options to be traded for the undersigned's account.

(Ex. 1 at 8). This language is of particular significance to this action because it contemplates discussions between Lanier and Tradewind SP about the company's specific trading program not covered in any of the written documents.

**I.     The Advisor's Agreement**

27.     The Advisor's Agreement identified Bradley Futch, not Gary Futch, as Lanier's CTA and stated that Bradley Futch had furnished Lanier with a disclosure document in accordance with the rules and regulations of the CFTC and the National Futures Association. (Ex. 1 at 9).

**J.      The Disclosure Document**

28.      The Futches provided Lanier with a copy of the Disclosure Document of Tradewind SP dated March 8, 2007, (the "Disclosure Document"), which Lanier signed as having received on August 29, 2007, the date of the Shenandoah Meeting.  (Ex. 2).

29.      As required by federal regulations, the Disclosure Document included the following generic warnings:

> THE RISK OF LOSS IN TRADING COMMODITY INTERESTS CAN BE SUBSTANTIAL. YOU SHOULD THEREFORE CAREFULLY CONSIDER WHETHER SUCH TRADING IS SUITABLE FOR YOU IN LIGHT OF YOUR FINANCIAL CONDITION.
>
> IF YOU PURCHASE A COMMODITY OPTION, YOU MAY SUSTAIN A TOTAL LOSS OF THE PREMIUM AND OF ALL TRANSACTION COSTS.
>
> IF YOU PURCHASE OR SELL A COMMODITY FUTURE, OR SELL A COMMODITY OPTION,  YOU MAY SUSTAIN A TOTAL LOSS OF THE INITIAL MARGIN FUNDS AND ANY ADDITIONAL FUNDS THAT YOU DEPOSIT WITH YOUR BROKER TO ESTABLISH OR MAINTAIN YOUR POSITION.
>
> UNDER CERTAIN MARKET CONDITIONS, YOU MAY FIND IT DIFFICULT OR IMPOSSIBLE TO LIQUIDATE A POSITION.  THIS CAN OCCUR, FOR EXAMPLE, WHEN THE MARKET MAKES A "LIMIT MOVE."
>
> A "SPREAD" POSITION MAY NOT BE LESS RISKY THAN A SIMPLE "LONG" OR "SHORT" POSITION.

(Ex. 2).

30.      The Disclosure Document identified Tradewind SP as a CTA, registered with the CFTC as of February 28, 2007, and identified Bradley Futch as Tradewind SP's sole principal. (Ex. 2).  This description of Tradewind SP differed from what Murphree and the Futches told Lanier at the Shenandoah Meeting about the corporate structure and ownership of the company, which he believed to be a limited liability corporation owned by Murphree, Gary Futch, and Bradley Futch.

Lanier did not inquire about these discrepancies at the Shenandoah Meeting because he did not read the Disclosure Document.

31.     The Disclosure Document described how Tradewind SP would direct Lanier's account.  It identified futures contracts in crude oil and the Standard & Poor's 500 Index[7] (S&P 500) as the primary futures trading markets.   The strategy was described simply as a "credit spread" approach:

> The program involves writing call and put options on the same market in order to receive the premiums for each sold position.  Concurrently, the program involves the purchase of the exact number of call and put options at different strike prices as a protective hedge device in case of adverse price movements.

(Ex. 2 at 6).  Tradewind SP, however, reserved "the right to trade options in a variety of ways and not limited to the credit spread approach."  (Ex. 2 at 7).

(Ex. 2 at 5-6).

32.     The Disclosure Documents also stated that in order to distribute risk over a two (or more) month period, Tradewind SP "will generally use approximately 50% of available funds in a client's account for a particular months trading." (Ex. 2 at 7).  This representation was different from Lanier's understanding that no single trade would exceed 25% of his total investment.

33.     The Disclosure Document included a compensation provision which explained that Tradewind SP would receive for its services an incentive fee based on trading performance and a management fee based on the amount of assets in the account.  (Ex. 2 at 12).  As an incentive fee, Tradewind SP would receive a monthly fee of up to 30% of net trading profits achieved in Lanier's

---

[7] The S&P 500 Index is a weighted compilation of 500 common stocks that purportedly measures the overall performance of the stock market.  Standard & Poor's Corp., Inc. v. Commodity Exch., Inc., 683 F.2d 704, 706 (2d Cir. 1982).  The price of an S&P 500 futures contract is based upon the value of the S&P 500 Index.  Id. at 707.

account at the end of each month. (Ex. 2 at 12). As a management fee, Tradewind SP would receive a monthly fee equal to 1/12 of 1% (a 1% annual rate) of the net asset value of Lanier's account at the end of each month. (Ex. 2 at 13).

34.     The Disclosure Document discussed the principal risk factors of Tradewind SP's trading program and included the following statements:

        a.      "Futures prices are highly volatile."

        b.      "Clients may incur, and will be responsible for, trading losses in excess of the capital contributed to the account."

        c.      "[T]he selling of options without having a long position in the underlying futures for call options or a short position in the underlying futures for put options (naked sale or short) is subject to risk of loss should the price of the underlying futures move beyond the strike price of the option. This loss may exceed the premium received for the initial sale of the option."

        d.      "Commodity markets may be illiquid making it impossible or difficult to liquidate a losing position. This could result in substantial losses to an account."

(Ex. 2 at 8-9).

**K.     Authorization for Fees**

35.     Pursuant to the Authorization for Fees signed by Lanier, MF Global was authorized to deduct the incentive and management fees from Lanier's account and pay these amounts directly to Tradewind SP. (Ex. 1 at 11).

**L.     History of Trading in Lanier's Account**

36.     On September 7, 2007, Gary Futch notified Lanier that MF Global had approved his Application and gave Lanier instructions to wire funds to MF Global. (Ex. 11 at 10). On October

9, 2007, Lanier wired $1,000,000 to MF Global. (Ex. 14). Lanier did not understand that he had just opened a margin account.

37.     On October 15, 2007, Gary Futch notified Lanier that they had executed their first trade in his account on that same day, that they had used 25% of his investment ($250,000), and that the trade had resulted in a profit of about $15,000. (Ex. 11 at 15). In response, Lanier asked Gary Futch a hypothetical question:  what would have happened to his account if the market had moved adversely? (Ex. 11 at 16). Gary Futch explained that he would have "put in an exit order," resulting in a possible loss of $30,000-$50,000. However, he described the loss as manageable because Lanier would recoup the loss in the next three trades and Lanier would lose only 25% of his investment. (Ex. 11 at 16). This exchange of e-mails between Gary Futch and Lanier is consistent with what the Futches told Lanier at the Shenandoah Meeting.

38.     From October, 2007 through May, 2008, Tradewind SP/Tradewind LLC continued to make discretionary trades in Lanier's account.   (Ex. 14).   Lanier spoke regularly with his friend Murphree about his investment.  It was a common practice for Murphree to arrange for Gary Futch to contact Lanier if he considered a specific question asked by Lanier too difficult or technical for him to answer.  Lanier's contact with Bradley Futch, however, was considerably less frequent.

39.     Unbeknownst to Lanier, Bradley Futch was the only one present at the Shenandoah Meeting who was a registered CTA. Lanier believed that Gary Futch personally directed the trades in his discretionary account and that Bradley Futch had only a minimal role in Tradewind LLC.  In reality, Gary Futch did indeed execute most of the trades, but only under Bradley Futches' authorization. Thus, the roles of father and son were reverse from what the Futches had told Lanier.

40.     Tradewind SP/Tradewind LLC paid compensation to Bradley Futch and Gary Futch from the incentive and management fees it received from MF Global out of Lanier's account.

41.     MF Global furnished written statements to Lanier, which showed the trading activity, profits, losses, and balance in his account.  (Ex. 14).  These statements show trades in S&P 500 Index options but do not show if those trades were "naked."

42.     Concerned about the risk involved in commodity futures and options trading–which Lanier began to fear was greater than what he understood at the Shenandoah Meeting–Lanier asked Murphree for further details about the risk management features of the program.  As was his practice when he was presented with a technical question, Murphree asked Gary Futch to address Lanier's concerns.  Gary Futch, in turn, asked Bradley Futch to formulate a written response.

**M.     The Letter**

43.     Bradley Futch sent Lanier an e-mail dated May 28, 2008, to which he attached a detailed letter (the "Letter") (Ex. 12).  This Letter, signed by both Futches, is the lynchpin of Lanier's fraud case for reasons that will become clear shortly.  At Trial, Gary Futch admitted that he had reviewed the Letter before it was delivered to Lanier, although he also admitted that he "should have read it a little closer."[8]  (Ex. 12).  In the first paragraph, the Futches stated that the purpose of the Letter was to provide a "clear understanding" of how their program manages risk.  They began the Letter by explaining that they sell "out of the money" options on  S&P 500 Index futures contracts or, in other words, that they sell call options above the market and put options below the market at the strike price.  They further explained that their goal was to sell options at a strike price that is not going to be violated or exceeded by the futures market within a certain time frame.  These representations do not conflict with what Lanier understood about the trading program and, indeed,

---

[8] The irony is not lost on this Court that the Futches criticize Lanier for failing to read the documents that created his investment account, yet offer no excuse for Gary Futch's own failure to read "closely" the Letter that he and Bradley Futch sent Lanier about their trading strategy.

Lanier himself referred to the Letter at Trial as a formal memorialization of their discussions at the Shenandoah Meeting.

44.    Also in the Letter, the Futches describe three ways in which their trading program manages risk.  The Court finds that these representations by the Futches about the trading program, all of which were false, were also made to Lanier at the Shenandoah Meeting.  The Court bases this finding in large part on Lanier's credibility.  Although the Court is aware that Lanier's testimony about what the Futches told him at the Shenandoah Meeting could be tainted by his having lost so much money, his version of what happened is entirely consistent with the documentary evidence, namely the Trade Methodology and the Letter.  The Futches' version, on the other hand, failed to include any explanation for the Letter, the absence of which renders their testimony that they never made these representations at the Shenandoah Meeting wholly implausible.

Moreover, the Court found the exceedingly casual demeanor of the Futches at Trial troubling.  Their testimony displayed a condescending tone of voice toward Lanier, who they clearly thought of as having an inferior business acumen and who they resented for trying to hold them responsible for what they attributed solely to the high volatility of the market on October 10, 2008.  This condescension is demonstrated by Gary Futch's testimony about why he failed to explain to Lanier the risk of commodities trading.  He used the analogy of a car to distinguish between those clients who wanted to know how the carburetor worked, and those who only wanted to know "where to put the gas."  Lanier, according to Gary Futch, fell into the latter category.  Although the Court agrees that not every investor necessarily needs the same quantity and/or quality of information about a particular investment, Gary Futch got it backwards.  An unsophisticated investor requires more information, not less information than a sophisticated investor, especially when the investor is a commodities-trading novice like Lanier and could not appreciate the risk himself.  Using the same

analogy, Gary Futch should have told Lanier not only "where to put the gas," but also about the risk of losing his car and even a second car that he did not yet own.

45.     The first of the false representations in the Letter was that the Futches never traded "naked":

> The money we take in from selling these options is called a premium.  Using some of the premium that we collected from the sold options, we then buy a protective position below the sold Put option and above the sold Call option.  This creates what is known as a "Credit Spread" and limits the risk involved in the position. . . . If we didn't purchase options above and below the sold positions, there would be unlimited risk (this will never happen because we always buy protection).  The profits that we make come from the difference in the sold and bought positions.

> Another thing to note is that many people will tell you that selling options is crazy and that you can lose everything.  This is very true if you sell "naked options"–selling an option without buying the protective position.  We ALWAYS buy the protection!

(Ex. 12).  At Trial, Bradley Futch testified that trades made in Lanier's account during the day were indeed "naked" because they were made without the protective position, when, for example, the put or call was sold before the protective position.  However, he never left any open positions (or "naked trades") in Lanier's account over night.  Lanier testified that the Futches never made any distinction to him between day trades and night trades.  Thus, according to Lanier, the Futches did not tell him, and he did not know, that during the day, they left positions open/"traded naked." The Court finds Lanier's testimony in this regard credible, especially since the Futches did not distinguish trades in this manner in the Letter.

46.     Second, the Futches falsely represented in the Letter that they never risked more than 25% in a single trade:

> We also only put 25% max of your money at risk into any one trade.  That means that if that trade was a complete loss, it would result in losing 25% of your account.  That being said, we do not allow complete losses using our risk management rules.

(Ex. 12). The Futches testified that limiting the percentage of trades was merely a goal, not an integral part of the trading program.

47.     Third, The Futches falsely represented in the Letter that they never traded on margin:

> Also, Futures accounts allow people to trade on margin or use "leverage" in their account. This can work both ways as it can accelerate Profits but also Losses. We do not trade on margin as we do not want to deal with margin calls. We are able to produce what we feel are great returns without the use of margin leverage. By doing this, the value of your account is the Maximum risk. But as stated previously, we only risk 25% of your account in any one trade and we are rarely if ever 100% in the market.

(Ex. 12). Bradley Futch testified that trades made in Lanier's account were indeed made on margin, however, there were no "open-ended" margins, another distinction not made in the Letter and according to Lanier, never mentioned to him.

48.     Lanier never bargained for the kind of risk that existed without these risk-reduction measures in place.

## N.    The Beginning of the End

49.     Until September 2008, Lanier's account showed a profit. At some point before September 2008, Tradewind SP became Tradewind LLC. The new entity made trades in Lanier's account, although Lanier never executed any documents authorizing Tradewind LLC to do so and never received a revised Disclosure Document. As far as Lanier knew, Tradewind LLC existed from the inception of his business relationship with the Futches.

50.     In September, 2008, Lanier told Gary Futch he had reservations about certain trading positions Gary Futch had taken in Lanier's account. Gary Futch assured Lanier that, at most, the positions would result in a loss of about 15% of Lanier's investment, but no more than that amount. Because the markets were so volatile, Gary Futch told Lanier that he was not going to execute any

new trades in his account for awhile. Based on this representation, Lanier agreed to continue allowing Tradewind LLC to trade his account.

51.     The trading positions that concerned Lanier resulted in an approximate loss of $213,594.46 in September 2008, or 17% of Lanier's account value. (Ex. 14 at 39). This loss was acceptable to Lanier because it occurred within the parameters of the trading program as he understood them and because he was no worse off then if had invested his money in the stock market.[9]

**O.     "Some Very, Very Bad News"**

52.     Notwithstanding the Futches' express representations to Lanier about the trading program, Gary Futch executed a trade in Lanier's account on Friday, October 10, 2008, that left another trade "naked," was on the margin, and exposed Lanier to unlimited risk. Gary Futch admitted at Trial that selling the protective position was a "dumb thing to do in hindsight." If he had adhered to what he had told Lanier a few weeks earlier and had not made any new trades, Lanier's losses would have been minimal and certainly not his entire investment plus an additional $1 million. He claimed he did it because he did not want to leave the trade "naked" over the weekend.[10] Bradley Futch testified that he authorized his father to execute the trades and attributed the loss to the evaporation of liquidity in the futures market.

---

[9] The failure of Lehman Brothers, at that time the fourth largest investment bank in the United States, and the near-failure of several other large financial institutions, occurred during this period of time. Andrew Ross Sorkin, Lehman Files for Bankruptcy; Merrill Is Sold, N.Y. Times, Sept. 14, 2008.

[10] Ironically, if he had not made the second trade but had left the trade "naked" over the weekend, Lanier would have made millions.

53.     On October 13, 2008, Lanier received an e-mail from Bradley Futch addressed to "Dear Client" which began with the ominous statement, "We have some very, very bad news regarding your account." (Ex. 11 at 43). He explained: "On Friday we attempted to leg out of some of the positions in your account. The extreme volatility (historic high) whip-sawed us so bad that we lost your entire cash balance PLUS. You now have a cash deficit/margin requirement that will need to be sent in immediately." (Ex. 11 at 43). According to the Futches, all of their clients lost all of the money in their accounts at MF Global and also ended up owing MF Global additional money because of substantial margin calls. The Court finds this testimony by the Futches to be the most credible of all their testimony at Trial.

54.     Later that same evening, on October 13, 2008, Gary Futch wrote Lanier the following e-mail:

> I just got off the phone with Bill [Murphree]. Bradley [Futch] sent you a statement last night that shows the devastation to your account. The shock I know is tremendous. We lost DOUBLE your original investment on Friday. I know this was not supposed to happen and you will be justifiably pissed. . . .

(Ex. 11 at 45). Lanier contended at Trial that this e-mail constituted an admission. Gary Futch testified that he meant the loss "was not supposed to happen" because the financial markets "went crazy that day" and not because the trades in Lanier's account failed to adhere to the parameters of the trading program, which is how Lanier interpreted his e-mail. The Court finds Lanier's interpretation more credible.

55.     Lanier understandably revoked the Power of Attorney he had previously granted "Tradewind."

56.    MF Global notified Lanier in a letter dated October 24, 2008, that there was a deficit in his account in the amount of $948,801.35 and demanded immediate payment in that amount pursuant to the terms of the Customer Agreement.  (Ex. 24).

57.    By e-mail dated November 3, 2008, Gary Futch presented Lanier with "your final debit" due in the amount of $948,801.35.

**P.    The State Court Lawsuit**

58.    MF Global sued Lanier in the Circuit Court of Cook County, Illinois, in case number 08 L 013668, (the "State Court Lawsuit") to recover $948,801.35.

59.    On February 20, 2009, Lanier filed cross-claims against the Futches and Tradewind LLC in the State Court Lawsuit alleging fraud.

60.    Bradley Futch filed a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code on May 28, 2009.

61.    On July 17, 2009, a Memorandum of Judgment was entered in the State Court Lawsuit against Gary Futch and Tradewind LLC, jointly and severally, in the sum of $1,948,801.35 (the "2009 Judgment").  (Ex. 25).  The Order filed contemporaneously with the 2009 Judgment indicated that it had been entered as the result of a default.  (Ex. 26).  In addition, the Order stated that it was "not an adjudication on the merits and is without effect as to MF Global." (Ex. 26). Lanier did not obtain a judgment against Bradley Futch in the State Court Lawsuit.  According to Lanier, he has not paid MF Global the deficit in his account, and the record does not reflect whether MF Global ever obtained a judgment against Lanier in the State Court Lawsuit.

62.    Gary Futch filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on August 10, 2009. (Case No. 09-51705-NPO, Bankr. Dkt. No. 1).

**Q.  Procedural History of Adversary**

63.     In his Adversary Complaints, Lanier asks this Court to enter judgment against Bradley

Futch in the amount of $1,948,801.35, plus interest and attorney's fees, and to except that judgment

from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), which does not discharge a debt obtained by

false pretenses, false representations or actual fraud and/or pursuant to 11 U.S.C. § 523(a)(4), which

does not discharge a debt resulting from fraud or defalcation while acting in a fiduciary capacity,

embezzlement, or larceny.  As to Gary Futch, Lanier asks this Court to except from discharge the

2009 Judgment rendered against him in the State Court Lawsuit in the amount of $1,948,801.35

pursuant to the same provisions of § 523.

64.     On November 26, 2010, the Futches filed a Trial Brief in Support of Defendants

(Futches' Brief) (Adv. Dkt. No. 26), and Lanier filed Plaintiff's Trial Brief (Lanier's Brief) (Adv. Dkt.

No. 27).

65.     A Pre-trial Order was entered on November 30, 2010.  (Adv. Dkt. No. 28).

66.     On December 3, 2010, Trial was held and oral arguments were presented by the

parties.

**Discussion**

The 2009 Judgment serves as the basis for Lanier's non-dischargeability claim against Gary

Futch.  Lanier, however, initiated this Adversary prior to any determination of liability of Bradley

Futch or the liquidation of Lanier's common-law fraud claim against Bradley Futch.  The absence of

a pre-bankruptcy judgment against Bradley Futch renders the posture of Lanier's non-dischargeability

claim against Bradley Futch different from his non-dischargeability claim against Gary Futch.  As a

result, before the Court can reach the merits of the dischargeability issue with regard to either Gary

Futch or Bradley Futch, the Court must first address the liquidation of Lanier's common-law fraud

claim against Bradley Futch.  See Morrison v. W. Builders of Amarillo, Inc. (In re Morrison), 555 F.3d 473, 478-80 (5th Cir. 2009) (bankruptcy court has jurisdiction not only to declare a debt non-dischargeable but also to liquidate the debt and enter a monetary judgment against the debtor).

After making that initial determination, the Court will address the dischargeability of the debts owed by both Bradley Futch and Gary Futch under § 523(a).  In making that inquiry, the Court must decide as a preliminary matter whether the 2009 Judgment has any preclusive effect in establishing the elements of Lanier's dischargeability claims against Gary Futch.  Next, the Court will consider the burden of proof that Lanier bears in the dischargeability proceedings against Bradley Futch and Gary Futch.  Finally, the Court will review the merits of Lanier's dischargeability claims against both Futches.

**A.      Common-Law Fraud Claim Against Bradley Futch**

**1.      Liability**

Whether Bradley Futch is liable to Lanier requires an examination of state law.  Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co., 549 U.S. 443, 450-41 (2007).  Because the transaction at issue here took place in both Mississippi and Alabama, the Court must decide which state's law applies.  Given that this Adversary concerns claims based on § 523(a), the federal choice of law rules govern that determination.  See Crist v. Crist (In re Crist), 632 F.2d 1226, 1229 (5th Cir. 1980). Those rules require the Court to determine which state has the most significant relationship to the particular substantive issue as to both the occurrence and the parties.  Id.  Here, this analysis requires a review of the relevant contacts of the occurrence and the parties with the states of Mississippi and Alabama.

Bradley Futch is a resident of Mississippi, and Tradewind SP was a Mississippi sole proprietorship of Bradley Futch.  Tradewind LLC was formed in Mississippi, where it has its principal

place of business.  The trades in Lanier's account that ultimately resulted in substantial losses were directed by Bradley Futch from Mississippi.  After the Shenandoah Meeting, Bradley Futch communicated with Lanier by e-mail from Mississippi, including the Letter. As to Alabama, Lanier lives there, and the Shenandoah Meeting took place in Alabama where Lanier agreed to invest in commodities trading and where he executed the paperwork necessary to open his account at MF Global.

At first blush, the contacts appear evenly balanced between Mississippi and Alabama in that fraudulent misrepresentations were made by Bradley Futch in both Mississippi and Alabama. However, because Bradley Futch directed the trades that resulted in Lanier's losses in Mississippi, the Court finds that Mississippi has the most significant relationship to the occurrence and will apply its substantive law.[11]

In Mississippi, a cause of action for common-law fraud requires proof by clear and convincing evidence of the following:  (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. Spragins v. Sunburst Bank, 605 So. 2d 777, 780 (Miss. 1992); Saucier v. Coldwell Banker JME Realty, 644 F. Supp. 2d 769, 785-86 (S.D. Miss. 2007) (applying Mississippi law).  A promise of future conduct meets the requirement of a "representation" if it is made with the present intent of not performing it.  Bank of Shaw v. Posey, 573 So. 2d 1355, 1360 (Miss. 1990).

---

[11]  The Court notes that it does not appear that there is any crucial difference between Mississippi law and Alabama law insofar as the legal issues raised in this Adversary are concerned. See Consol. Constr. Co. of Ala. v. Metal Bldg. Components, 961 So. 2d 820, 825 (Ala. 2007) (listing elements for common-law fraud in Alabama similar to those in Mississippi).

In this case, Lanier has proved by clear and convincing evidence the elements of common-law fraud. Bradley Futch made false representations at the Shenandoah Meeting, which he later repeated in writing in the Letter, regarding the risk-reduction strategies of their trading program. He misrepresented to Lanier that Tradewind LLC never traded on margin, that Tradewind LLC never "traded naked," and that no more than 25% of Lanier's investment could ever be lost in a single trade. Although these representations involve both past and future conduct, Bradley Futch knew that trades in Lanier's account would not comport with these promises. These false representations were material in that without these representations, Lanier would not have opened an account at MF Global and would not have allowed Tradewind SP or Tradewind LLC to execute trades in his account. Bradley Futch, who was far more knowledgeable than Lanier in commodities trading, knew that these representations were false. Bradley Futch intended that Lanier, an unsophisticated commodities investor, rely upon these representations, and because of his inexperience, Lanier was ignorant of the true risk of the investment. Lanier actually relied on these representations and was justified in doing so. Ill. Cent. RR Co. v. Harried, 681 F. Supp. 2d 772, 777 (S.D. Miss. 2009) (in Mississippi, common-law fraud requires proof of only justifiable reliance, a less exacting standard than reasonable reliance). Finally, Lanier sustained substantial losses as a direct result of the actions of Bradley Futch.

At Trial, Bradley Futch and Gary Futch asserted several reasons why the discharge exception in § 523(a)(2)(A), which incorporates many of the same elements of proof as the common law of fraud, did not apply to the debts they owed Lanier. To the extent that those arguments also constitute challenges to Lanier's common-law fraud claim against Bradley Futch under Mississippi law, the Court rejects them for the reasons set forth in the discussion addressing the dischargeability issue. In summary, the Court concludes that Lanier has established a claim for common-law fraud in Mississippi against Bradley Futch.

2.      **Damages**

Lanier seeks to recover from Bradley Futch damages in the amount of $1,948,801.35, plus attorney's fees.  See Cohen v. de la Cruz, 523 U.S. 213, 223 (1998) (discharge exception under § 523(a) is not limited to value of property fraudulently obtained but encompasses all liability, including attorney's fees if otherwise available).  As to the amount that includes his initial investment of $1 million, Lanier does not seek to recover any of the profits in his account prior to September, 2008, or any of the incentive fees or management fees MF Global paid to Tradewind SP or Tradewind LLC from his account.  On the other hand, he seeks the *full* return of his initial investment, even though it is unclear whether his account would have sustained losses anyway given the crisis in the financial markets that took place at the time of his investment.  As to the amount that includes $948,801.25, the amount of the margin call, the record does not reflect the status of the litigation commenced by MF Global against Lanier in the State Court Lawsuit.  It is unknown, for example, if Lanier filed a counterclaim against MF Global.  Bradley Futch presented no evidence at Trial disputing the amount of damages claimed by Lanier.

In Mississippi, compensatory damages include damages that will replace the loss caused by the wrong or injury, Lee v. S. Home Sites Corp., 429 F.2d 290, 293 (5th Cir. 1970), and the plaintiff has the burden of proving those damages with reasonable certainty.  Adams v. U.S. Homecrafters, Inc., 744 So. 2d 736, 740 (Miss. 1999).  "The plaintiff should not be deprived of its right to recover because of its inability to prove with absolute certainty the extent of the loss."  Id.  Applying this standard, the Court finds that Lanier has carried his burden of proving his damages against Bradley Futch in the amount of $1,948,801.35 with reasonable certainty based on the parties' testimony at Trial and the joint trial exhibits, which together demonstrate that Lanier sustained at least this amount in investment losses.  (Ex.14 at 1 & 42; Ex. 22).

As to Lanier's request for attorney's fees, Mississippi follows the "American Rule" and does not normally assess attorney's fees against the losing party in the absence of statutory authority. Huggins v. Wright, 774 So. 2d 408, 412 (Miss. 2000). Lanier did not cite any state statute awarding attorney's fees in his Adversary Complaints, and the Court has found none.[12] Thus, the Court denies Lanier's request for attorney's fees.

**B.      Dischargeability of the Debts of Bradley Futch and Gary Futch Under § 523(a)**

The denial of the discharge of a debt, especially when the debt amounts to a substantial sum of money, is a harsh remedy. It is for that reason that § 523(a)(2)(A) and § 523(a)(4) except from discharge only those debts incurred by debtors who have not been honest and forthcoming about their affairs or who have violated their fiduciary duties by conducting their affairs in a particularly reckless manner.

As mentioned previously, the Court must consider as a preliminary matter whether the 2009 Judgment has any preclusive effect in establishing the elements required under § 523(a)(2)(A) or § 523(a)(4) before deciding whether the debt against Gary Futch, as reflected by the 2009 Judgment entered in the State Court Lawsuit, falls within either of these discharge exceptions. Notably, Lanier did not allege that Gary Futch was collaterally estopped from re-litigating the issue of non-dischargeability in the Adversary Complaints, the Pre-trial Order, or Lanier's Brief.

**1.      Collateral Estoppel and the 2009 Judgment Against Gary Futch**

The United States Supreme Court has held that the doctrine of issue preclusion, also known as collateral estoppel, may apply in § 523(a) discharge exception proceedings to prevent re-litigation of issues previously decided by a state court. Grogan v. Garner, 498 U.S. 279, 284 (1991). The

---

[12] The Bankruptcy Code does not provide for the recovery of attorney's fees by the prevailing party in discharge litigation. McCoun v. Rea (In re Rea), 245 B.R. 77, 90 (Bankr. N.D. Tex. 2000).

ultimate determination of the dischargeability of a debt, however, rests within the exclusive jurisdiction of the bankruptcy court. Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta), 394 F.3d 347, 349-50 (5th Cir. 2004).  In considering the preclusive effect of a prior state court judgment, federal courts must apply whatever preclusive effect a court of the same state that rendered the judgment would afford that judgment.   Shimon v. Sewerage & Water Bd. of New Orleans, 565 F.3d 195, 199 (5th Cir. 2009).  Because the 2009 Judgment was rendered by an Illinois court,  this Court's inquiry begins with a review of the Illinois rules of issue preclusion.  Gober v. Terra + Corp.(In re Gober), 100 F.3d 1195, 1201 (5th Cir. 1996).

In the case at bar, the State Court Lawsuit ended in a default judgment after Gary Futch failed to respond or appear.  In Illinois, the preclusive effect of a default judgment under the doctrine of collateral estoppel is not clear.  There is no decision from the Illinois Supreme Court definitively addressing the issue.  The United States Court of Appeals for the Fifth Circuit in Caton v. Trudeau (In re Caton), 157 F.3d 1026 (5th Cir. 1998), interpreted Illinois law as allowing application of the doctrine of collateral estoppel to default judgments but only if there was a full and fair opportunity to litigate the issue in the prior action and if there would be no undue unfairness.  Id. at 1027-28. With due respect to the Fifth Circuit, that decision has been criticized by a bankruptcy court in Illinois.  See  Clear Channel Outdoor, Inc. v. Nikitas (In re Nikitas), 326 B.R. 127, 132 (Bankr. N.D. Ill. 2005) (disagreeing with Caton and holding that default judgments have no collateral estoppel effect under Illinois law).

Given the uncertainty in Illinois law on this issue and given that Lanier did not attempt at Trial to prove the elements of his non-dischargeability claim against Gary Futch based upon the 2009 Judgment, it is unnecessary for this Court to determine whether collateral estoppel applies to the 2009 Judgment.  Therefore, the Court will engage in a determination independent of the 2009 Judgment

to ascertain whether Gary Futch's conduct falls within the parameters for a finding of non-dischargeability under § 523(a).  This analysis is the same one the Court must use in reviewing Bradley Futch's conduct.  For that reason, the Court will consider the conduct of the Futches together in making its dischargeability determination.  In that regard, the Court notes that the Futches, represented by the same counsel, were consistent in their testimony about what happened.

### 2.    Burden of Proof under § 523(a)

To except the aforementioned debts of Bradley Futch and Gary Futch from discharge under § 523(a), Lanier bears the burden of proving his factual allegations by a preponderance of the evidence.  Grogan, 498 U.S. at 287-88.  A fact is proven by a preponderance of the evidence if the Court finds it more likely than not that the fact is true.  EPA v. Sequa Corp. (In re Bell Petroleum Servs., Inc.), 3 F.3d 889, 909-10 (5th Cir. 1993).  Although exceptions to discharge are construed strictly against the creditor, and liberally in favor of the debtor, Laughlin v. Nouveau Body & Tan LLC (In re Laughlin), 602 F.3d 417, 421 (5th Cir. 2010), the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" Grogan, 498 U.S. at 287 (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)).  Indeed, the provisions of § 523 specifically prohibit a "fresh start" to perpetrators of fraud.  Here, Lanier alleges that the debts are non-dischargeable under  § 523(a)(2)(A) and § 523(a)(4).

### 3.    § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition. . . ." 11 U.S.C. § 523(a)(2)(A).  Section 523(a)(2)(A) encompasses three similar grounds for non-dischargeability, all of which apply to "debts obtained by frauds involving moral turpitude or

intentional wrong." First Nat'l Bank LaGrange v. Martin (In re Martin), 963 F.2d 809, 813 (5th Cir. 1992). In defining the elements of non-dischargeability under § 523(a)(2)(A), the Fifth Circuit has recognized a distinction between the somewhat overlapping elements of proof required for (1) "false pretenses or false representations" and (2) "actual fraud." AT&T Universal Card Servs. v. Mercer (In re Mercer), 246 F.3d 391, 402-03 (5th Cir. 2001); RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1292 (5th Cir. 1995). Thus, the Court will consider the "actual fraud" exception in § 523(a)(2)(A) as a separate category.[13] Lanier contends, and the Court agrees, that there was sufficient evidence at Trial supporting all three categories for non-dischargeability.

### a.    Debt Arising by False Pretense or False Representation

A debtor's representation is a false pretense or false representation under § 523(a)(2)(A) if it was: (1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the other party. RecoverEdge, 44 F.3d at 1293. There is a subtle distinction between a false pretense and a false representation in that a false pretense involves conduct that creates a false impression while a false representation involves an express statement. FNFS, Ltd. v. Harwood (In re Harwood), 404 B.R. 366, 389 (Bankr. E.D. Tex. 2009). It is worth noting that a promise to perform a certain act in the future cannot constitute either a false pretense or false representation even if the debtor's subsequent breach is unjustified. Bank of La. v. Bercier (In re Bercier), 934 F.2d 689, 692 (5th Cir. 1991). A debtor's statement of his intentions, however, may fall within the ambit of the statute if the debtor had no intention of performing as promised when he made the representation. Allison v. Roberts (In re Allison), 960 F.2d 481, 484 (5th Cir. 1992).

---

[13] The Fifth Circuit in Mercer questioned whether the distinction survived Field v. Mans, 516 U.S. 59 (1995), but found it unnecessary to resolve the issue. Mercer, 246 F.3d at 403.

### b.    Debt Arising by Actual Fraud

In order to prove non-dischargeability for § 523(a)(2)(A) actual fraud, the evidence must show that either in the inducement or in the actual transaction:  (1) the debtor made a  representation; (2) at the time it was made, the debtor knew it was false; (3) it was made with the intent and purpose to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result of its reliance.  Gen. Elec. Capital Corp. v. Acosta (In re Acosta), 406 F.3d 367, 372 (5th Cir. 2005); Rea, 245 B.R. at 85.

### c.    Was the Futches' Conduct Fraudulent?

The evidence at trial showed that the Futches fraudulently induced Lanier to invest his money with MF Global and to allow Tradewind SP/Tradewind LLC  to trade futures in his account based on false pretenses and/or false representations.   As mentioned previously, Lanier relied on the following fraudulent statements made by the Futches at the Shenandoah Meeting, and later memorialized in the Letter, related to the risk-reduction strategies of their trading program:  that they never traded on the margin, they never "traded naked," and that no more than 25% of Lanier's investment could ever be lost in a single trade.   These same misrepresentations support a non-dischargeability claim for actual fraud because (1) at the time the Futches made these representations, they knew the representations were false; (2) the Futches made the representations with the intent and purpose to deceive Lanier because the Futches knew that Lanier would not invest with Tradewind SP/Tradewind LLC (or maintain his investment there) if they did not make these representations; (3) Lanier actually and justifiably relied on the representations; and (4)  Lanier sustained substantial losses as a proximate result of his reliance on the representations made by the Futches.  See Rea, 245 B.R. at 86 (securities broker fraudulently induced a dentist and his spouse to invest their money in day trading and was denied a discharge under both § 523(a)(2)(A) and  § 523(a)(4)); Lock v. Scheuer

(In re Scheuer), 125 B.R. 584, 591 (Bankr. C.D.Cal. 1991) (debt was excepted from discharge under § 523(a)(2)(A) and § 523(a)(4) because broker had fraudulently induced risky investment in futures contracts); Nassbridges, 434 B.R. at 587-88 (commodities broker was denied a discharge under both § 523(a)(2)(A) and § 523(a)(4) on ground he fraudulently induced cattle ranchers to invest in gold futures).  To induce Lanier to invest with Tradewind SP/Tradewind LLC, the Futches promised to trade Lanier's account in a particular way but failed to trade in the manner agreed upon.  In effect, the Futches played a game of "bait-and-switch."

The Futches maintained at Trial that Lanier's claims against them do not fall within the § 523(a)(2)(A) discharge exception because (a) they had no actual intent to deceive Lanier, (b) they obtained no money directly from Lanier, and (c) the Disclosure Document sufficiently informed Lanier of the risk of loss in trading commodity futures.  The Court will address each of these arguments in turn.

### (i.)     Intent to Deceive

The Futches contend, and correctly so, that § 523(a)(2)(A) applies only to fraud in fact, and not to implied fraud.  They further contend that they did not intend to harm Lanier, but made every effort to make him money.  Indeed, the evidence shows that their efforts proved successful for almost one year.

Because a debtor will rarely admit that he intended to deceive a creditor, the Futches' protestations of innocence, without regard to their sincerity, have little probative value.  What is relevant is whether the Court can infer from the evidence presented at Trial a "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentations." Acosta, 406 F.3d at 372.  The Court has no trouble answering this inquiry in the affirmative.

The misrepresentations made by the Futches regarding their risk-reduction strategies have already been discussed at length. They made other misrepresentations not previously discussed that show they did not honestly believe what they told Lanier about their trading program at the Shenandoah Meeting. In particular, they greatly diminished Bradley Futch's role in the business. They misled Lanier into believing that Tradewind SP was a limited liability corporation run principally by Gary Futch. As previously stated, it was Gary Futch, not Bradley Futch, whom Murphree introduced to Lanier, it was Gary Futch, not Bradley Futch, who solicited Lanier's investment, and it was Gary Futch, not Bradley Futch, who answered most of Lanier's questions. Lanier testified that he would not have invested with Tradewind LLC if he had known the actual roles of the Futches in the business. Who would doubt Lanier's veracity on this point? At that time, Bradley Futch was a recent college graduate in his mid-twenties. Viewing the whole transaction from above, the Futches' conduct demonstrates that they intended to deceive Lanier from the inception of their business relationship when Murphree introduced Gary Futch to Lanier.

In the Futches' Brief, the Futches cite <u>Friendly Finance Service v. Dorsey (In re Dorsey)</u>, 505 F.3d 395 (5th Cir. 2007), in support of their argument. In <u>Dorsey</u>, the Fifth Circuit affirmed the district court's decision upholding the bankruptcy court's determination in a dischargeability proceeding brought under § 523(a)(2)(A). The bankruptcy court ruled that because the debtor did not intend to deceive his lender, § 523(a)(2)(A) did not apply. The lender alleged that the debtor misrepresented his ownership of shotguns he had pledged as collateral for a loan. Even so, the bankruptcy court found that at the time the loan was made, the debtor did not intend to deceive the lender because the shotguns were in the debtor's possession. On appeal, the Fifth Circuit found no clear error in this factual finding.

Except to the extent that the holding in Dorsey recognizes that the intent to deceive is a necessary element of proof under § 523(a)(2)(A), this case provides no support for the Futches. The loan at issue in Dorsey bears no resemblance to the investment made by Lanier or to the machinations of the Futches.

Although given the opportunity at Trial, the Futches did not produce any evidence contradicting the inferences raised against them. The Futches professed that they traded Lanier's account no differently than the accounts of their other customers. Their belief that this testimony removes the taint of fraudulent intent, reveals the fallacy of their trading strategy. Rather than directing trades tailored to Lanier's individual level of risk tolerance, they directed trades at the risk tolerance level of their other customers, which was inconsistent with their promise to Lanier that, "[w]e ALWAYS buy the protection!" (Ex. 12).

The Futches also complain that Lanier lost money only because of unforeseeable circumstances. However, the Futches represented to Lanier that their particular risk-reduction strategies worked even "[w]hen something dramatic like [September 11th or the market crash in 1987] happens . . . ." (Ex. 6 at 3-4).

### (ii.)   Fruits of the Fraud

The Futches also maintain that Lanier cannot invoke § 523(a)(2)(A) because Lanier wired the money to MF Global, not to them. They point out that Lanier retained legal title to his investment and could have directed his own trades, or even liquidated his account, at any time. They also point out that they did not benefit monetarily from their fraud. They admit, however, that they received a percentage of Lanier's investment from MF Global through Tradewind SP (and later through Tradewind LLC) in the form of incentive and management fees. The exact amount they received is

unknown from the record but assumably would not nearly match the amount of Lanier's losses of $1,948,801.35.

The Fifth Circuit has held that § 523(a)(2)(A) is not limited to money or property in which title transfers to the debtor but only requires proof of a debt procured through fraud. See Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.), 239 F.3d 746, 749 (5th Cir. 2001); Cohen, 523 U.S. at 223 (holding that the phrase "obtained by" in § 523(a)(2) modifies "money, property, services or . . . credit," not "any debt"). Moreover, the Futches clearly did obtain some monetary benefit from their fraud by way of incentive and management fees. The Court rejects the untenable notion suggested by the Futches that § 523(a)(2)(A) requires a showing that a debtor profited in an amount equal to the losses caused by the debtor's fraud. See Scheuer, 125 B.R. at 588.

### (iii.)   Justifiable Reliance

The Futches contend that Lanier was not justified in relying on their misrepresentations in making his initial investment. The Futches do not dispute that § 523(a)(2)(A) requires only justifiable, not reasonable reliance, and is a less exacting standard than reasonable reliance. Field, 516 U.S. at 74. In that regard, the Court notes that justifiable reliance requires a subjective determination based on "the qualities and characteristics of a particular plaintiff, and the circumstances of a particular case" without resort to the standard of a reasonable person. Field, 516 U.S. at 70-71 (quoting Restatement (Second) of Torts § 545A, Comment b (1976)). A person may be justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." Id. (quoting Restatement (Second) of Torts § 537 (1976)). Stated another way, unless the falsity of a misrepresentation is obvious, or unless there are "red flags" that serve as a warning that he is being deceived, a person's reliance is justifiable. Mercer, 246 F.3d at 418.

The Futches complain in the Futches Brief that Lanier was not justified in ignoring the warnings in the Disclosure Document, which included both the generic warnings required by federal regulations promulgated by the CFTC and the warnings that appeared in the discussion about the principal risk factors of Tradewind SP's trading program.  The Futches contend that Lanier was not justified in relying on the oral misrepresentations made at the Shenandoah Meeting in light of these warnings.

Implicit in the Futches' argument is that knowledge of the warnings in the Disclosure Document should be imputed to Lanier, who, as previously noted, testified that he did not read any of the materials presented to him at the Shenandoah Meeting.  Regardless of whether Lanier's failure to read the materials was his personal choice or was the result of his not having had a fair opportunity to study them, the Court will view Lanier's decision to invest,  for the purpose of the issue of justifiable reliance, as if he did so with full knowledge of the warnings in the Disclosure Document.

In support of their argument, the Futches cite Colombo Bank v. Sharp (In re Sharp), 340 Fed. Appx. 899 (4th Cir. 2009).  There, the United States Court of Appeals for the Fourth Circuit reviewed a district court's affirmance of a bankruptcy court's ruling that the discharge exception under § 523(a)(2)(A) did not apply because the bank failed to prove that its reliance on certain loan documents provided by the debtor was justified "[g]iven the lack of history between the parties, the irregularity of these documents and the sophistication of the plaintiff [bank]." Id. at 904.  The district court agreed with the bankruptcy court's finding that the nature of the relationship of the parties was not of the sort that would support the bank's blind reliance on the debtor's misrepresentation.  Id. at 905.  The Fourth Circuit affirmed the district court and in doing so noted that several "red flags" should have alerted the bank–a sophisticated entity–of the need to investigate  further.  Id. at 907.

The Futches compare the warnings in the Disclosure Document to the "red flags" found by the bankruptcy court in the Sharp case. The Futches' analogy fails because the reasonableness of a claim of justifiable reliance requires consideration of the sophistication of the investor, and unlike the bank in Sharp, Lanier was not a sophisticated commodities investor. Although the Futches portray Lanier as an astute and wealthy businessman, he had no experience in commodity futures or options trading, as he disclosed in his Application. Moreover, Lanier's lack of sophistication was demonstrated by the nature of the questions he asked Murphree after his investment. (Ex. 11).

In addition, the generic warnings in the Disclosure Document were just that. For example, the cautionary (and conspicuous) statement, "THE RISK OF LOSS IN TRADING COMMODITY INTERESTS CAN BE SUBSTANTIAL," is boilerplate language, not intended to apply to any specific trading program. The warnings that appeared in the discussion about the principal risk factors of Tradewind SP's strategy are likewise insufficient to render Lanier's reliance unjustified, but for a different reason. Although the statement about "naked" sales is certainly specific in its description of risk and is the precise risk that caused Lanier's losses,[14] the Trade Methodology given to Lanier at his initial meeting with Gary Futch and the oral misrepresentations made by both Futches at the Shenandoah Meeting render this language superfluous because the Futches told Lanier that they never traded "naked." If Lanier had read the warning, it would not have signaled a "red flag" to him because the risk discussed in the warning did not pertain to him given the particular way the Futches proposed to trade commodity options in his account. As may be recalled, the Futches stated in the

---

[14] Specifically, the statement in the Disclosure Document warned that "the selling of options without having a long position in the underlying futures for call options or a short position in the underlying futures for put options ('naked' sale or short) is subject to risk of loss should the price of the underlying futures move beyond the strike price of the option. This loss may exceed the premium received for the initial sale of the option." (Ex. 2 at 9).

Letter, "[M]any people will tell you that selling options is crazy and that you can lose everything. This is very true if you sell "naked options"–selling an option without buying the protective position. We ALWAYS buy the protection!"  (Ex. 12).  The Disclosure Document cannot be considered in a vacuum but must be considered in the total mix of information the Futches provided Lanier.  In that context, the warnings in the Disclosure Document did not render Lanier's reliance on the misrepresentations unjustified.

The Futches also complain in the Futches' Brief that Lanier cannot rely on the Letter as evidence of fraud because the Letter came after the transfer of funds.  The Futches ignore the fact that according to Lanier, whose testimony the Court has found credible, the Futches made oral misrepresentations at the Shenandoah Meeting that mirrored those contained in the Letter.  It is these oral misrepresentations that form the basis for Lanier's claim that the Futches fraudulently induced him to invest.  In summary, the Court finds that Lanier justifiably relied on the false representations.

### 4.       § 523(a)(4)

The final exception to discharge alleged by Lanier is § 523(a)(4), which pertains to a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  The phrase "while acting in a fiduciary capacity" modifies only the words "fraud or defalcation" and not "embezzlement" or "larceny."  Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598, 602 (5th Cir. 1998).  Thus, the embezzlement and larceny exceptions to discharge apply to a debt without regard to whether the debtor was acting as a fiduciary.  Id.  For a debt to be non-dischargeable under the first prong of § 523(a)(4), two elements must be proven: (1) a fiduciary relationship existed; and (2) the debtor committed fraud or defalcation while acting in his capacity as a fiduciary.  Lanier alleges that the debts owed by Gary Futch and Bradley Futch were procured by fraud and/or were the result of defalcation while they were acting in a fiduciary capacity.  The

Court determines first whether a fiduciary relationship existed between the parties.

### a.    Did the Futches Have a Fiduciary Duty to Lanier?

The definition of a fiduciary under § 523(a)(4) is narrower than the traditional meaning under the common law in that it is limited to instances involving express or technical trusts.  Texas Lottery Comm'n v. Tran (In re Tran), 151 F.3d 339, 342 (5th Cir. 1998).  Also, the duties of a fiduciary must arise independent of, and must have been imposed prior to, rather than by virtue of, any alleged wrongful act by the fiduciary.  Id. at 342-43.  Accordingly, constructive trusts, implied  trusts, and equitable trusts fall short of the requirements of § 523(a)(4).  Id.  Moreover, ordinary commercial relationships such as debtor/creditor and principal/agent are insufficient to come within the provisions of § 523(a)(4).  On the other hand, the Fifth Circuit has recognized that § 523(a)(4) is not limited to formal trust agreements but includes relationships in which "trust-type obligations are imposed pursuant to statute or common law."  LSP Inv. Partnership v. Bennett (In re Bennett), 989 F.2d 779, 784-85 (5th Cir. 1993). Under § 523(a)(4), the concept of "fiduciary" presents a question of federal law, although state law is important in determining whether a trust relationship exists in a particular situation.  Gupta, 394 F.3d at 350.

Under Mississippi law,[15] a commodities broker owes a fiduciary duty to his customer in his treatment of his customer's discretionary account "to properly advise and properly invest."  Puckett v. Rufenacht, Bromagen & Hertz, Inc., 587 So. 2d 273, 279 (Miss. 1991).  As Lanier points out in Lanier's Brief, a broker relationship has also been found to be a fiduciary one under § 523(a)(4) by other bankruptcy courts. See  Nassbridges, 434 B.R. at 587-88 (investors who entrusted commodities broker with investment stood in "fiduciary capacity" to broker); Rea, 245 B.R. at 88 (day trader who

---

[15] The Court has already concluded that Mississippi law applies.  See infra p. 24.

acted as securities broker owed fiduciary duty to clients). Here, it is undisputed that Lanier's account with MF Global was a discretionary account controlled by the Futches. For that reason, a fiduciary relationship existed between the parties. See Baker v. Wheat First Securities, 643 F. Supp. 1420, 1428-29 (S.D. W. Va. 1986) (discussing dichotomy between a discretionary account and a non-discretionary account). The Futches contend that Lanier did not relinquish total control over his account and could have directed trades himself. Even so, there is no question that the Futches had at least equal control, which according to Mississippi law is sufficient to establish a fiduciary duty "to properly advise and properly invest." Puckett, 587 So. 2d at 279.

### b.   Was There Fraud or Defalcation by the Futches?

The second element of § 523(a)(4) requires evidence of fraud or defalcation. Because defalcation does not require a showing of actual intent and applies to conduct that does not necessarily reach the level of fraud, this Court "need go no further than the test for defalcation" in finding the debts non-dischargeable under § 523(a)(4). See Moreno v. Ashworth (In re Moreno), 892 F.2d 417, 421 (5th Cir. 1990).

The Bankruptcy Code does not define the term "defalcation." The Fifth Circuit has held that the term is a very broad concept which includes the willful neglect of fiduciary duty. Office of Thrift Supervision v. Felt (In re Felt), 255 F.3d 220, 226 (5th Cir. 2001). The "willful neglect" of fiduciary duty is "essentially a recklessness standard." Schwager v. Fallas (In re Schwager), 121 F.3d 177, 185 (5th Cir. 1997). Willfulness is measured by reference to what a reasonable person in the debtor's position knew or reasonably should have known. Felt, 255 F.3d at 226; see also United States v. Boyle, 469 U.S. 241, 245 (1985) (defining "willful neglect" as a "conscious, intentional failure or reckless indifference."). This standard, therefore, requires the Court to focus upon the willfulness of

the Futches' conduct, given what they knew or should have known about the commodity futures market.

### c.    Did the Futches Willfully Neglect Their Fiduciary Duty?

Lanier clearly placed great confidence in the Futches to protect his financial interests and relied upon their expertise by entrusting them with $1 million in his account at MF Global and, as it turned out, much more money than that.  In return, the Futches, whose knowledge and experience in commodity trading was far superior to Lanier's, gambled Lanier's money away.  The material misrepresentations the Futches made to Lanier demonstrate at a very minimum the recklessness required for a finding of defalcation under § 523(a)(4).

In short, this Court has no difficulty finding that the obligation should be non-dischargeable under § 523(a)(4) because the Futches' defalcation violated the fiduciary relationship.  The Futches took Lanier's money on one set of assumptions and invested it under an entirely different set.  Because the Court has found that the § 523(a)(4) exception to discharge applies, it is unnecessary to determine if the actions of the Futches also constitute "embezzlement" or "larceny."

### Conclusion

Lanier contends in Lanier's Brief that "[a]s opposed to Icarus, who was warned of the dangers of flying too high but ignored his father's warnings, [Lanier] was warned of some of the dangers and listened to [the Futches].  However, [Lanier] was not warned of the real danger–the [Futches'] own misrepresentations that ultimately caused [Lanier's] damages."  See Lanier's Brief at 7.  The Futches counter in the Futches' Brief that "Lanier entered into the extremely high risk arena of commodities trading and margin trading without so much as reading the documents that created his account.  That type of foolish behavior is not protected by the Bankruptcy Code anymore than Icarus (son of Daedalus) flying into the sun with wax wings."  See Futches' Brief at 3.   The Court

finds that Lanier's use of the Greek myth of Icarus better illustrates the facts of this case.  Contrary to the Futches' arguments at Trial, Lanier did not act foolishly in placing his trust in the Futches, who were introduced to him through a long-time friend, who held themselves out to be experienced and well-educated in the field of commodities trading, and who falsely represented to him their intent to implement a trading strategy that could "limit . . . market exposure in the event of a severe or sudden move in the market." (Ex. 6).  The Futches cannot use their bankruptcy discharges as a shield from the consequences of their conduct.

In conclusion, the Court finds that Lanier should be awarded a judgment in the amount of $1,948,801.35, against Bradley Futch, who is to be held jointly and severally liable with Gary Futch, and that the aforementioned judgment and the 2009 Judgment against Gary Futch in the same amount, should be excepted from discharge pursuant to § 523(a)(2)(A) and § 523(a)(4).

A separate final judgment will be entered in accordance with Federal Rule of Bankruptcy Procedure 7058.

SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated:  February 4, 2011